ORIGINAL

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA**

FILED IN CHAMBERS
U.S.D.C. Atlanta

MAR 17 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* | : : : : : | |
| **JESSICA HAWK,** | : : : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : : : | **1:16-CV-0863** |
| **vs.** | : : : | **JURY TRIAL DEMANDED** |
| **PRIMARY CARE PHYSICIAN CENTER, P.C., BEN D. THOMAS JR., M.D., AND DONNA S. THOMAS,** | : : : : : : | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. 3729** *et seq.* |
| **Defendants.** | : | |

## <u>COMPLAINT</u>

COMES NOW plaintiff-relator Jessica Hawk, by and through undersigned counsel, and brings this False Claims Act Complaint on behalf of the United States of America, against Defendants Ben Thomas Jr., M.D., his wife Donna S. Thomas, and Primary Care Physician Center, P.C. (hereinafter referred to as "PCPC"). This action is brought by plaintiff to recover civil penalties and treble damages under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

1

## INTRODUCTION

1. This is an action to recover treble damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records and claims made, or caused to be made, by defendants and/or their agents and employees.

2. This *qui tam* case is brought against defendants for submitting and/or causing the submission of false claims by knowingly submitting reimbursement claims to Medicare, 42 U.S.C. § 1395 *et seq.*, Veterans Administration, TRICARE/CHAMPUS 10 U.S.C. § 1071 *et seq.*, and Federal Employee Health Benefits Program, 5 U.S.C. §§ 8901, *et seq.* (hereinafter collectively referred to as "federal healthcare programs") for medically unnecessary treatments.

## JURISDICTION AND VENUE

3. This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and subject matter jurisdiction under the federal False Claims Act, 31 U.S.C. § 3732.

4. Venue lies in this district under 28 U.S.C. § 1391 (b) and (c) and 31 U.S.C. § 3732 (a) because defendants transacted business and committed acts in violation of 31 U.S.C. § 3729 in this district.

## THE PARTIES

5. Relator-Plaintiff Jessica Hawk ("Relator") is an adult citizen and resident of the State of Georgia. Relator was employed by defendants from October 31, 2014 to September 27, 2015. In that employment, at defendants' direction relator billed or assisted defendants in billing defendants' medical patients, their health insurers, government entities, and combinations thereof, or witnessed defendants doing so. Relator Hawk gained that employment, in part, because of her education in healthcare management by Herzing University, including classes in medical care billing and reimbursement. During her employment with defendants relator Hawk periodically trained on and was updated on defendants' billing procedures and regularly reviewed Medicare bulletins. Relator has independent knowledge of all of the below allegations against defendants and is the original source of the allegations contained herein.

6. Defendant PCPC was a health care facility serving communities in Georgia, located within Fulton County, Georgia. The PCPC principal place of business was at 5197 Roswell Road, Atlanta, GA. Upon information and belief, defendant PCPC is now closed and defendant Dr. Thomas works for another healthcare provider which defendants do not own.

7. Defendant Donna S. Thomas was the practice manager of defendant PCPC. Upon information and belief, defendant Dr. Thomas and his wife,

3

defendant Donna S. Thomas, were and are the only owners of PCPC.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    The Federal False Claims Act

8.   The False Claims Act provides that any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the United States government is liable for damages in the amount of three (3) times the amount of loss the government sustained and penalties which range between $5,500 and $11,000 per claim.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3.  For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, …(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* At § (b). "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA. *Id.*

### II. Federal Healthcare Programs

#### A. Medicare

9.  Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* establishes the Health Insurance for the Aged and Disabled Program, more popularly known as the Medicare program.  The Medicare program is a federally operated and

funded program. It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

10. The Medicare program is comprised of four parts, but only Medicare Parts A and B are relevant in this action. Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically eighty percent) of the fee schedule amount of physician and laboratory services. 42 U.S.C. §§ 1395k, 13951, 1395x(s).

11. To participate in Medicare, providers must certify that their services are provided economically and only when and to the extent medically required, or that the services are "reasonable and necessary," as required by statute. 42 U.S.C. § 1395n; 42 U.S.C. §1395y(a)(1)(A). A service is expressly excluded from coverage if it is "not reasonable and necessary" for "the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. § 411.15(k)(1). In other words, it is an express condition of payment that the treatment sought under Medicare must be medically necessary. *Id.*; 42 C.F.R. § 411.15 (delineating "[p] articular services excluded from coverage"); *id.* at § 411.1(b)(1) (stating that "[t]his subpart identifies: (1) The particular types of services that are excluded" from coverage); see also 42 C.F.R. Subpart 411 (titled "Exclusions From Medicare and Limitations on Medicare Payment").

## B. TRICARE/CHAMPUS

12. In 1967, the Department of Defense created the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), which is a federally funded medical program. 10 U.S.C. § 1071. CHAMPUS beneficiaries include active military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

13. In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Since the establishment of TRICARE in 1995, both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE." The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. § 199.17(a)(1). The TRICARE Management Activity ("TMA") oversees this program.

14. The TRICARE managed healthcare programs are created though contracts with managed care contractors in four geographic regions: North, South, West, and overseas. The Defendants serve patients in the South TriCare region. TRICARE health services are provided through both network and non-network participating providers. Providers who are Medicare-certified providers are also considered

TRICARE-authorized providers.  TRICARE-authorized providers are either "Network Providers" or "Non-Network Providers."

15.  "Network Providers" include hospitals, other authorized medical facilities, doctors and healthcare professionals, all of whom enter into an agreement with the region's managed care contractor, and provide services for an agreed reimbursement rate.  32 C.F.R. § 199.14(a).  "Non-Network Participating Providers" include hospitals, other authorized medical facilities, doctors, and healthcare professionals who do not enter an agreement with the region's managed care provider, and are reimbursed at rates established by TRICARE regulations. *Id.*

16.  Just as with Medicare and Medicaid, TRICARE providers have an obligation to provide services and supplies at only the appropriate level and "only when and to the extent medically necessary." 32 C.F.R. § 199.6(a)(5).

17.  TRICARE's governing regulations, like Medicare's and Medicaid's requirements, also are based upon "medical necessity."  TRICARE's governing regulations require that services provided be "furnished at the appropriate level and only when and to the extent medically necessary," and such care must "meet[] professionally recognized standards of health care [and be] supported by adequate medical documentation . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care."

32 C.F.R.199.6(a)(5). In this respect, similar to Medicare and Medicaid, services Provided at a level higher than medically necessary are improper and violations of TRICARE. Id.

### C. Federal Employee Health Benefits Program

18.  The Federal Employee Health Benefits Program ("FEHBP") is a federally funded medical insurance program for federal employees, retirees, their spouses and unmarried dependent children under age 22, administered by the Office of Personnel Management ("OPM") pursuant to 5 U.S.C. §§ 8901, et seq. Through the OPM, the Government contracts with private health plans or "carriers" to deliver health benefits to its employees.  Monies for the FEHBP are maintained in the Employees' Health Benefits Fund ("Health Fund"), and are administered by OPM. 5 U.S.C. § 8909. Federal agencies and their employees contribute to the Health Fund to cover the total cost of health care premiums. 5 U.S.C. § 8906. The monies from the Health Fund are used to reimburse the carriers for claims they pay on behalf of FEHBP beneficiaries.

19.    Like Medicare Part B and TRICARE, FEHBP will not cover any treatment or surgery that is not medically necessary. 5 U.S.C. § 8902(n)(1)(A).

### D.  Federal and state government healthcare programs' reimbursement requirements for evaluation and management services.

20.  Both state and federal healthcare programs determine reimbursements to

providers based on the medical necessity of procedures, services, and hospital admissions. Medical necessity must be determined prior to the performance of each medical service and must be clearly documented in a physician's order. It cannot be determined retroactively.  Federal regulations define a "prior determination of medical necessity" to mean "an individual decision by a Medicare contractor, before a physician's service is furnished, as to whether or not the physician's service is covered" by the federal healthcare program. 42 C.F.R. § 410.20.  If the service is not medically necessary, Federal Healthcare Programs will not reimburse the provider.

21.  Doctors submit claims to Medicare, Medicaid, TRICARE and FEHBP on the HCFA 1500 claims form.  The Form 1500 requires the doctor to describe the services provided to the patient using standardized numeric codes, called CPT Codes, which are developed by the American Medical Association. The CPT Codes for Evaluation & Management ("E/M") services range from Level I, for the least complicated services for cases of low severity to Level V, for complex services for cases of high severity. The Federal Healthcare Programs reimburse the higher levels of E/M services at a significantly higher rate.

31.  For each claim defendants submitted to Medicare, Medicaid, TRICARE or FEHBP for reimbursement, defendants certified that the services were "medically indicated and necessary for the health of the patient." Defendants also agreed that

if they "knowingly file[d] a statement of claim containing any misrepresentation or any false, incomplete or misleading information [they] may be guilty of a criminal act punishable under law and may be subject to civil penalties."

32.  Defendants were aware of, or should have been aware of, the conditions for repayment under the Medicare, Medicaid, TRICARE and FEHBP Programs referred to in the preceding paragraphs.

22.  Medicare Part B permits providers to use either of two Evaluation and Management Documentation Guidelines.  These Guidelines are discussed in more detail infra at paragraphs 33-35.  CPT Codes are used to report E/M services. While providers must insure that the Guidelines' requirements for the individual CPT Codes are met when selecting the appropriate CPT Code, medical necessity for the service must also be met. According to Medicare, it is not medically necessary or appropriate to bill a higher level of E/M service when a lower level of service is all that is medically necessary. Documentation in the medical record must support the level of service chosen.

23.  Medical necessity of E/M services is generally expressed in two ways, by the frequency of services and the intensity of service -- which corresponds to the CPT level. The provider's documentation of E/M services reported to Medicare must demonstrate that both the frequency and the intensity of the E/M service were appropriate considering the nature of the patient's complaint and condition.

10

Medicare's determination of medical necessity is separate from its determination that the E/M service was rendered as billed. Medicare judges the provision of the service based on CPT E/M Code definitions and the CMS E/M Service Documentation Guidelines (1995 and 1997 versions).

24. The CPT Codes that govern E/M services are as follows: for new patients, 99201 to 99205; and for established patients, 99211-99215. Each level reflects an increased level of acuity of the patient's presenting complaint; the number of physical systems evaluated and managed during the encounter; the acuity and/or duration of the problems evaluated and managed; and the complexity of documented co-morbidities that have clearly influenced the physician's work. The CPT Codes thus reflect an increasing level of complexity of "medical decision making."

25. CPT Code 99212 is defined as an office or other outpatient visit for the evaluation and management of an established patient which requires at least two of these three key components: a problem-focused history; a problem-focused examination; or straightforward medical decision making. Usually the presenting problems are self-limiting or minor. Physicians typically spend 10 minutes face to face with the patient and/or family. CPT Code 99213 is defined as an office or other outpatient visit for the evaluation and management of an established patient which requires at least two of these three key components: an expanded problem-

focused history; an expanded problem-focused examination; medical decision making of low complexity. Usually the presenting problems are self-limiting or minor. Physicians typically spend 15 minutes face to face with the patient and/or family.

26. CPT 99214 is defined as an office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of these three key components: a detailed history; a detailed examination; and medical decision making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problems are of moderate to high severity. Physicians typically spend 25 minutes face to face with the patient or family. See Current Procedural Terminology, Fourth Edition. An office visit qualifying for CPT Code 99215 is identical, except that it involves medical decision-making of high complexity and typically involves a forty minute patient visit. Medicare makes clear that in order to bill the highest levels of visit codes, the visit must include a comprehensive history that includes a review of all of the systems and a review of a complete past family and social history, whether taken at that visit or a prior visit.

### III. Defendants' improper billing (up-coding) of evaluation and management services to federal healthcare programs.

28.  Almost immediately after joining PCPC in October 2014, relator Hawk identified a practice of improper coding and billing federal healthcare programs for office visits.  The issue relator identified was the billing for E/M services (office visits) at levels that were not supported by the documentation in the medical record.

29.  PCPC has one medical doctor, defendant Ben D. Thomas, Jr., M.D.  Dr. Thomas Jr., serves as the medical director of PCPC.  Defendants Thomas and PCPC often are the main health care provider for its patients.

30.  At PCPC, defendants' revenue or personal income depends upon the number of patients they see or the revenue they generate.  Medicare assigns each CPT Code an RVU, which when multiplied by the conversion factor (which converts the RVU (relative value unit) to an actual dollar amount) and a geographical adjustment (which accounts for the geographic differences in the cost of practice across the country), creates the compensation level for a particular service. CMS pays the bulk of the physician fees, under Medicare Part B, through RVUs. Medicare Claims Processing Manual, c. 12, sec. 20.2.

31.  There is a direct correlation between a doctor's compensation and the billing code he or she chooses for reimbursement from third party payers.

13

32. After the patient visit, the physician's transcription scribe enters the chart notes, including ICD9/ICD10 diagnosis codes into the chart note for review. The clinical medicalassistant circled the CPT Code for any procedures that occurred at that visit on a pre-printed charge sheet or "super bill," and, while relator worked there, forwarded that form to Defendant Donna Thomas, PCPC's coder. Defendant Donna Thomas reviewed the documented diagnosis codes and circled the CPT codes for the level of office visit that she deemed appropriate, and from the beginning of relator Hawk's employment in October 2014 through August 2015 relator sent the completed superbills to a third-party medical billing company called ABI. ABI then submitted the codes that were documented on the super bills to the patients and their insurance carriers.  From August 2015 through the end of Ms. Hawk's employment in September 2015 Defendant Donna Thomas on many occasions entered that code into Athena, the software package that PCPC uses to submit its claims for professional fees.

33.  At the time Defendant Donna Thomas entered the code for billing submission, she frequently did not have the complete and signed medical record, so that she could not determine whether the documentation in the medical record supported the billing charge.

34. Defendant Donna Thomas submitted the charges to ABI and ABI submitted the charges at the level chosen by Ms. Thomas. In August 2015 Defendant Donna

Thomas began entering the charges into the billing system herself, instead of relator Hawk submitting them. Then, the information was transmitted electronically through Athena to be submitted for payment. Defendant Donna Thomas submitted the charge to federal healthcare programs through its fiscal intermediaries. In the case of Medicare this was done through Cahaba Government Benefit Administrators, for payment by CMS. Hewlett Packard Enterprise Services serves as the fiscal intermediary for Medicaid and Humana Military Healthcare Services, Inc. For TRICARE. Defendants did not review these charges to ensure the medical record supports the level of acuity claimed prior to passing them on to its fiscal intermediaries for submission to the federal payors. During relator Hawk's employment, there were times she was ordered to prepare the super bills for submission. Relator Hawk would review as much of the medical records that were available to her at that time and would circle the level of care based on that information in the medical record and would then give the super bills to Defendant Donna Thomas to review them. After looking at the medical records, Defendant Donna Thomas often changed the level of service to a higher level.

35.   Relator was frequently advised by Defendant Donna Thomas that relator was not billing in the manner that Ms. Thomas saw fit and would tell relator that relator needed to bill federal healthcare programs at the higher levels of service for office visits in order for PCPS to receive better compensation rates knowing the higher

levels of service were fictitious or fraudulent.

36. Defendant Dr. Thomas had a person called a scribe who entered Dr. Thomas' dictation into medical records and bills. Dr. Thomas told the scribe what to document and the scribe entered it into the EHR system.

37. For the majority of the time relator Hawk was employed by PCPC, the charting system used was Practice Fusion. Since the chart note did not have to be completed and signed in order to submit the billing of the claims, the chart notes often took months to be completed and signed.

38. With Athena, the billing could not be submitted without the chart note being completed. Defendant Donna Thomas often completed the chart notes when Defendant Dr. Thomas' scribe was not available to do so, such as after hours and on weekends, so that she could proceed with billing out the claims despite her lack of knowledge or understanding of what services took place during that patient's office visit.

39. During her employment with defendants between October 31, 2014 and September 27, 2015 relator on numerous occasions witnessed Defendant Donna Thomas intentionally add and/or change diagnosis codes listed in the chart notes without justification to fraudulently bill at higher service levels. Ms Thomas would look at the patient's chronic diagnosis codes in the chart and would add them into that office visit billing even if that diagnosis had not been addressed during that

16

office visit. Relator shows during her employment with defendants, defendants presented for payment many bills to the above-mentioned federal healthcare programs knowing said bills contained unjustified and fraudulent codes, thereby knowingly submitting false claims to said federal healthcare programs.

40. Defendant Donna Thomas advised relator and other medical assistants on multiple occasions to perform procedures that she and Dr. Thomas referred to as "standing orders" that included performing urinalysis, taking blood glucose levels, performing EKGs and pulmonary function testing on any patient that came in with specific diagnosis codes regardless of their reason for coming in for an office visit that day. Defendant Donna Thomas explained that these procedures could be billed at every visit because of the previous diagnosis and allowed for the office visit to be coded at a higher rate because it gave support to other conditions being treated at that office visit. Relator on several occasions voiced her concerns about the unethical nature of these "standing orders" but was advised by Defendant Donna Thomas that if relator did not comply with performing them as directed relator's employment would be at risk.

41. During relator Hawk's employment with defendants relator received complaints from patients about their bills and the services for which their insurance providers had been billed. Patients frequently complained that they were being billed for procedures that were never performed. Relator notified Ms. Thomas of

these complaints and Ms. Thomas addressed them either by removing the charge from the patient's bill or by refusing to change the charges and advising the patient that the charges were justified by the chart note.

42.  Defendants wrongfully discharged relator because of relator's efforts to stop violations of the federal False Claims Act, 31 U.S.C. §§ 3729, et seq.

## COUNT I

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(A) (2009)
### (Presenting or Causing Presentment of a False Claim)

42.  Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

43. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the above-mentioned federal healthcare programs of the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(a).

## COUNT II

### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1)(B)
### (Knowingly Presenting a False or Fraudulent Record)

44. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

18

45. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements to get the above-described false or fraudulent claims paid or approved by said federal healthcare programs of the United States Government in violation of 31 U.S.C. § 3729(a)(1)(b) and presented or caused to be presented false or fraudulent claims to the said programs of the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(b).

46. The said programs of the United States Government paid many such false claims upon relator's information and belief.

## COUNT III

### FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G)
### (False Record to Avoid an Obligation to Refund)

47. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

48. Defendants knowingly caused to be made or used false records or false statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the above-mentioned federal healthcare programs of the United States Government and knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to said programs.

49. By virtue of the false records or false statements caused to be made by defendants, the United States suffered damages and therefore is entitled to treble

damages under the False Claims Act, to be determined at trial, plus civil penalties of $5,500 to $11,000 for each violation.

## COUNT IV

## WRONGFUL DISCHARGE

52. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

53. By virtue of the acts described above, defendants are liable to relator for defendants' wrongful and retaliatory termination or discharge of relator under the False Claims Act referenced above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America, through relator, requests the Court enter the following relief:

A. That defendants be ordered to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

B. That this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

C. That relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act.

20

D. That relator be compensated for defendants' wrongful discharge of relator pursuant to 31 U.S.C. § 3729 et seq.;

E. That relator be awarded all costs of this action, including attorney fees and expenses; and

F. That relator recover such other relief as the Court deems just and proper.

This 17th day of March, 2016.

_____
**H. DAVID BULLARD**
State Bar No.094245
Attorney for Relator

EDWARDS & BULLARD, LLP
3370 Vineville Ave., Suite 102
Macon, Georgia  31204
(478) 254-3606
(478) 254-3536 facsimile
dbullard@edwardsandbullardlaw.com

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of this Complaint and written

disclosure of substantially all material evidence and information relator possesses

has been served on the Government as provided in FRCP 4.

Dated: 3-17-16

**H. DAVID BULLARD**
State Bar No.094245
Attorney for Relator

EDWARDS & BULLARD, LLP
3370 Vineville Ave., Suite 102
Macon, Georgia  31204
(478) 254-3606
(478) 254-3536 facsimile
dbullard@edwardsandbullardlaw.com

22